UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -:

CRAIG B. SMITH,                           :     15 Civ. 5356 (ER) (JCF)

                                          :
                                                REPORT AND
                    Plaintiff,            :     RECOMMENDATION

                                          :
     - against -                          :
                                          :
COMMISSIONER OF SOCIAL SECURITY,          :
                                          :
                    Defendant.            :

- - - - - - - - - - - - - - - - - -:

TO THE HONORABLE EDGARDO RAMOS, U.S.D.J.:

| USDS SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 1/4/17 |

     The plaintiff, Craig B. Smith, brings this action pursuant to

section 205(g) of the Social Security Act (the "Act"), seeking

review, under 42 U.S.C. § 405(g), of a determination of the

Commissioner of Social Security (the "Commissioner") finding that

he is not entitled to Supplemental Security Income ("SSI") or

Social Security Disability Insurance ("SSDI").   The parties have

submitted cross-motions for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure.   For the

reasons that follow, I recommend that the Commissioner's motion be

denied, the plaintiff's motion be granted, and the case be remanded

to the Social Security Administration (the "SSA") for further

proceedings.

Background

     A.   Personal and Vocational History

     The plaintiff, who was born on May 9, 1968, filed an

application for SSI and SSDI on March 22, 2012, when he was forty-

1

three years old.  (Administrative Record ("R.") at 126).  Mr. Smith
has a GED.  (R. at 27).  He worked as a Metropolitan Transportation
Authority ("MTA") bus operator from January 2000 until his injury
in June 2011 and has not worked since.  (R. at 28, 161).  Mr. Smith
lives in New Jersey with his wife and fourteen-year-old daughter.
(R. at 24-26).

B.    Hospital and Physician Records

On June 29, 2011, the plaintiff went to St. Luke's-Roosevelt
Hospital Center complaining of mild to moderate left knee pain
after a toaster fell on his knee at work.  (R. at 221, 226).  An
x-ray of the knee revealed no acute fracture, no subluxation, no
joint space narrowing, and no effusion.  (R. at 221, 229).  There
was osseous productive change at the anterior patella and left
tibial tubercle.  (R. at 221).  The plaintiff was treated with
ibuprofen, diagnosed with contusion of the knee, and discharged
that same day.  (R. at 221-22, 227).  The plaintiff was ambulatory
upon discharge, and his pain level was one out of ten.  (R. at
222).

1.    Treating Physicians

a.    Dr. Maxim Tyorkin

On September 16, 2011, the plaintiff saw Dr. Maxim Tyorkin,
an orthopedic surgeon.  (R. at 327).  Mr. Smith reported swelling,
weakness, cracking, and popping in his left knee.  (R. at 327).
Physical therapy and medication "help[ed] somewhat."  (R. at 327,

2

329).  Upon examination, Dr. Tyorkin noted joint pain, stiffness, muscle pain, and cramps.  (R. at 328).  The plaintiff was in no apparent distress, and range of motion in the left knee was 0-90 degrees (normal range was noted to be 0-140 degrees).  (R. at 238). There was pain with deep flexion as well as medial joint line tenderness.  (R. at 328).  Ligamentous examination was grossly intact, as was the plaintiff's neurovascular status.  (R. at 328). Dr. Tyorkin assessed left knee internal derangement, osteochondral lesion, and post-traumatic chondromalacia.  (R. at 328).  He recommended  activity  modification,  physical  therapy,  anti-inflammatories, and pain management.  (R. at 328).  Dr. Tyorkin noted that the plaintiff was temporarily totally disabled, and the prognosis was guarded.  (R. at 329).

Dr. Tyorkin noted no significant changes at an October 21, 2011 follow-up appointment.  (R. at 330).  The plaintiff reported minimal relief with physical therapy.  (R. at 330).  Dr. Tyorkin administered a hyaluronic acid injection in the left knee.  (R. at 331).  On January 12, 2012, the plaintiff underwent left knee arthroscopy,  chrondroplasty,  partial  synovectomy,  and  medial femoral condyle microfracture.  (R. at 323).  The procedures were performed by Dr. Tyorkin with no noted complications.  (R. at 323).

At a January 20, 2012 follow-up appointment with Dr. Tyorkin, the plaintiff was using crutches and not bearing weight on his left leg.  (R. at 332).  On February 17, 2012, Mr. Smith said he

3

was "somewhat improved" and was using a cane instead of crutches. (R. at 334).  Range of motion in his left knee was 0-90 degrees, and mild effusion was present.  (R. at 334).  The prognosis was guarded and the plaintiff was characterized as temporarily totally disabled.  (R. at 334).  On March 6, 2012, he complained of continuing pain in his left knee and was using a cane and knee brace.  (R. at 336).  The plaintiff also noted right knee pain from increased weight bearing due to compensation for the left knee.  (R. at 336).  Range of motion in the left knee had improved to 0-110 degrees.  (R. at 336).  There was pain with deep flexion, and he had mild effusion and moderate quadriceps atrophy.  (R. at 336).

At an April 20, 2012 follow-up appointment, Dr. Tyorkin noted that the range of motion in the plaintiff's left knee was 0-115 degrees and 0-130 degrees in the right knee.  (R. at 338).  The plaintiff also complained of elbow pain due to his use of a cane. (R. at 338).  The prognosis was guarded, and the plaintiff was noted to be temporarily totally disabled.  (R. at 339).

Mr. Smith returned to Dr. Tyorkin on May 25, 2012.  (R. at 340).  He complained of pain in both knees and was using a cane and a brace.  (R. at 340).  Range of motion in the left knee was 0-110 degrees and 0-130 degrees in the right knee.  (R. at 340). The plaintiff returned to Dr. Tyorkin on October 5, 2012.  (R. at 342).  He complained of pain in both knees and was using a cane

4

and a brace.  (R. at 342).  Range of motion in the left knee was 0-115 degrees.  (R. at 342).  There was pain with deep flexion and joint line tenderness.  (R. at 342).  Dr. Tyorkin administered a hyaluronic acid injection to the left knee.  (R. at 342).  The plaintiff was noted to have a moderate, partial disability and a poor prognosis.  (R. at 343).  Mr. Smith saw Dr. Tyorkin again on January 4, 2013, and May 17, 2013, with no significant changes noted.  (R. at 344-47).  Range of motion in his left knee had improved to 0-120 degrees in May, and he had a moderate, partial disability as related to the left knee only.  (R. at 346-47).

### b.  Dr. Michael Hearns

The plaintiff attended physical therapy at Central Medical Services of Westrock ("Westrock") approximately two to three times per week from July 13, 2011, through January 6, 2014.  (R. at 350-475, 482-89, 490-506).  There, the plaintiff was treated by Dr. Michael Hearns[1] regularly.  (R. at 270).  At his initial session on July 13, 2011, the plaintiff reported that his pain level was six to seven out of ten (moderate) and was present all day.  (R. at 352).  He described it as an aching pain, aggravated by bending, twisting, climbing, and kneeling.  (R. at 352).  It was relieved

---

[1] The ALJ mischaracterized Dr. Hearns as a physical therapist who is not a medically licensed physician, referring to him as "physical therapist Michael Hearns" rather than "Dr. Hearns."  (R. at 15).  Although he primarily provided physical therapy services to the plaintiff, Dr. Hearns is a medically licensed physician. (R. at 237).

by lying down or taking medication.  (R. at 352).  Standing, walking, lifting, sitting, self-care, or repetitive movement did not aggravate the pain.  (R. at 352).  Upon examination, flexion and extension in the left knee were to 110 degrees (normal was noted to be 135 degrees).  (R. at 351).  The plaintiff tolerated his treatment well.  (R. at 354).

Throughout Dr. Hearns' treatment of the plaintiff from July 2011 through January 2014, he consistently noted limitations for standing, walking, climbing, kneeling, and repetitive motions. (R. at 236-46, 251-57, 487-89, 496-506).  On June 13, 2012, Dr. Hearns completed a progress report for the New York State Workers' Compensation Board.  (R. at 241-42).  He noted that the plaintiff was unable to work and had a 100% temporary impairment.  (R. at 242).

On July 10, 2012, Dr. Hearns completed a Function Report. (R. at 270).  Dr. Hearns noted that he first saw Mr. Smith on July 13, 2011, and saw him three times a month for physical therapy. (R. at 270).  The plaintiff could lift and carry up to thirty pounds, stand or walk less than two hours per day, and had no limitations in sitting.  (R. at 270).  The plaintiff also had unspecified limitations in pushing and pulling.  (R. at 270).

2.   Consulting Physicians

On July 5, 2011, the plaintiff saw Dr. Matthew Clarke, a specialist in family medicine and occupational medicine.  (R. at

247-49).   The plaintiff complained of left knee pain and stated that he had been walking with a cane.  (R. at 247).  The plaintiff had also developed pain in his right knee due to compensation for the left knee.  (R. at 247).  His right knee pain was becoming worse than his left knee pain.  (R. at 247).  Upon examination, there was tenderness in both knees.  (R. at 248).  He had full range of motion in both knees.  (R. at 248).  Dr. Clarke assessed a left knee contusion and stated that the plaintiff had temporary total disability for his job as a bus driver.  (R. at 248).  He further noted that the plaintiff had developed right knee overuse syndrome and right knee pain, and he referred the plaintiff to physical therapy.  (R. at 248).  The plaintiff was to continue treating his pain with ibuprofen.  (R. at 248).  The prognosis was guarded, and the plaintiff was restricted from lifting, pushing, pulling, carrying, sitting, standing, walking, climbing, and kneeling.  (R. at 248-49).

An MTA Work Status/Availability Checklist, completed by a physician on March 30, 2012, noted that Mr. Smith was unable to lift, push, or pull any amount of weight and could not operate a motor vehicle.  (R. at 423).  The plaintiff's abilities to climb and kneel were also limited.  (R. at 423).  No limitations in sitting, walking, twisting, or bending were reported.  (R. at 423).

On May 19, 2012, Dr. Roger Daniel Ignatius, a hand and plastic surgeon, completed a progress report for the New York State

7

Workers' Compensation Board.  (R. at 264-67).  Dr. Ignatius noted that Mr. Smith had a torn ligament, tendon, or muscle.  (R. at 265).  The plaintiff had reduced range of motion in his left knee and was unable to work due to his left knee injury.  (R. at 266-67).  The prognosis for recovery was poor.  (R. at 266).

On August 10, 2012, Dr. Samuel Wilchfort conducted a consultative examination of the plaintiff.  (R. at 276-77).  The plaintiff reported that a toaster had fallen on his left knee in June 2011 and that he underwent an arthroscopic procedure on his left knee in January 2012.  (R. at 276).  Following this procedure, he began attending physical therapy sessions, and, at the time of the consultative examination, the plaintiff was still attending physical therapy three times a week.  (R. at 276).  The plaintiff alleged that he was unable to walk and had to use a cane "all the time."  (R. at 276).  He also treated his knee pain with ibuprofen, famotidine, and tramadol daily.  (R. at 276).

Upon examination, Mr. Smith had an antalgic gait and was unable to walk without a cane.  (R. at 276).  The plaintiff was also wearing a soft brace on his left leg.  (R. at 276).  He was unable to toe walk, heel walk, or squat.  (R. at 276).  He had full range of motion in his hands, wrists, elbows, shoulders, and cervical spine.  (R. at 276).  The plaintiff was unable to bend over due to his knee pain.  (R. at 276).  Straight leg raise testing was to eighty degrees on the right and forty-five degrees

8

on the left, with complaints of knee pain. (R. at 276). Both knees appeared "normal." (R. at 276). Flexion was to 150 degrees in the right knee and to ninety degrees in the left knee, with extreme pain. (R. at 276). His ankles were normal. (R. at 276). Dr. Wilchfort concluded that the left knee appeared normal, but the plaintiff clearly had decreased range of motion. (R. at 277). He further stated that the plaintiff would be unable to perform any job that required "any activity." (R. at 277).

### 3.   Magnetic Resonance Imaging ("MRIs")

An MRI scan of the plaintiff's left knee on August 11, 2011, revealed a small effusion, a 1.7-centimeter chronic osteochondral lesion[2] of the medial femoral condyle with full-thickness articular cartilage loss, and mild to moderate chondromalacia patellae. (R. at 260-61).

A June 15, 2012 MRI of the left knee revealed cartilage thinning and fissuring, no meniscal tear, no evidence of chondromalacia patellae, and evidence of a grade one sprain that was not appreciated in the August 2011 MRI. (R. at 258-59).

---

[2] An osteochondral lesion is a tear or fracture in the cartilage covering one of the bones in a joint. Cedar & Sinai, Osteochondral Lesions/Osteochondritis Dessicans, https://www.cedars-sinai.edu/Patients/Health-Conditions/Osteochondral-Lesions-Osteochondritis-Dessicans.aspx (last visited Dec. 28, 2016).

A September 3, 2013 MRI of the plaintiff's right knee revealed grade II chondromalacia, no meniscal tear, and a small effusion/mild synovitis. (R. at 477).

C.    Physical Therapy Records

In addition to treating with Dr. Hearns, the plaintiff treated with physical therapists at Westrock who were not licensed physicians. (R. at 350-475). Through September 14, 2011, the plaintiff routinely noted pain and difficulty moving his left knee, and the therapist regularly noted tenderness. (R. at 358-73). In a September 16, 2011 Re-Evaluation Report, range of motion in his left knee was noted to be 40 degrees upon both flexion and extension. (R. at 376). The plaintiff reported the pain level in his left knee as moderate and lasting all day. (R. at 377). He described it as sharp, dull, and throbbing. (R. at 377). It was aggravated by sitting, standing, walking, and bending, and relieved by lying down and medication, which included Motrin and tramadol. (R. at 377).

From September 21 through October 26, 2011, the plaintiff routinely noted pain and difficulty moving his left knee, and the therapist noted tenderness. (R. at 378-90). In an October 28, 2011 Re-Evaluation Report, range of motion in his left knee was noted to be 45 degrees upon both flexion and extension. (R. at 392). The plaintiff reported the pain level in his left knee as moderate and lasting all day. (R. at 393). He described it as

sharp, dull, and throbbing. (R. at 393). It was aggravated by self-care, sitting, standing, walking, and bending, and it was relieved by lying down and taking medication, which included ibuprofen and tramadol. (R. at 393).

On November 2, 2011, the therapist noted an unspecified increase in range of motion in the plaintiff's left knee. (R. at 395). The plaintiff was tolerating treatment well, and his progress was satisfactory. (R. at 395). Through January 10, 2012, the treatment reports noted an increase in range of motion and satisfactory progress, but the plaintiff continued to report pain and difficulty moving his left knee. (R. at 395-419). There were no reports of tenderness. (R. at 295-419).

A February 29, 2012 Re-Evaluation Report reported tenderness and noted that the plaintiff's functional limitations included walking and standing. (R. at 420). Range of motion in his left knee was 15-40 degrees upon both flexion and extension. (R. at 421).

From March 5 through March 20, 2012, Mr. Smith continued to report pain and difficulty moving his left knee, and the therapist routinely noted an increase in range of motion. (R. at 425-31). A March 21, 2012 Re-Evaluation Report reported tenderness and noted that the plaintiff's functional limitations included climbing stairs and walking. (R. at 432). Range of motion in his left

knee was 0-100 degrees upon both flexion and extension. (R. at 433).

From March 21 through April 16, 2012, the plaintiff continued to report pain and difficulty moving his left knee, and the therapist routinely noted an increase in range of motion. (R. at 434-44). An April 2012 Re-Evaluation Report reported tenderness and noted that the plaintiff's functional limitations included walking and stairs. (R. at 445). Range of motion in his left knee was 0-80 degrees upon flexion and extension. (R. at 446).

A June 1, 2012 Re-Evaluation Report noted that the plaintiff walked with a cane and his functional limitations included weight bearing. (R. at 452). Range of motion in his left knee was 20-90 degrees upon both flexion and extension. (R. at 453). Flexion in his right knee was to 20 degrees. (R. at 453).

Treatment notes from April 19 through December 28, 2012 contained no significant changes. (R. at 447-75). An August 13, 2012 Re-Evaluation Report noted that Mr. Smith had an antalgic gait and walked with a cane. (R. at 467). His functional limitations included prolonged walking and stair climbing. (R. at 467). Range of motion in his left knee was 5-70 degrees upon both flexion and extension.[3] (R. at 468).

---

[3] On September 25, 2013, the plaintiff was diagnosed with a lymphoid tumor on his scalp. (R. at 516). He cited no limitations caused by the tumor and testified that it was not the reason he was not working. (R. at 39-40).

D.    Procedural History

Mr. Smith filed an application for SSI and SSDI on March 21, 2012, alleging a disability onset date of June 29, 2011, due to injuries to his left knee and right pinky finger. (R. at 11, 126-27, 155). He completed a Function Report in connection with his application for benefits on May 21, 2012. (R. at 169). He described experiencing pain, throbbing, burning, and swelling in his left knee. (R. at 170). He stated that he used a knee brace and cane every day and that his functional limitations included lifting, stair climbing, squatting, sitting for a long period, bending, kneeling, standing for a long period, and concentration. (R. at 173-175). He did "light cleaning, ironing, and laundry" about once per week. (R. at 171). He also stated that he could drive and went to the grocery store twice per month with his wife. (R. at 172). He noted that he could walk up to ten blocks with a knee brace and cane before needing to take a five-minute break. (R. at 174).

Mr. Smith's application was denied initially on September 5, 2012, and denied again on reconsideration on December 17, 2012. (R. at 11, 52, 62). Thereafter, the plaintiff requested a hearing, and on March 20, 2014, a hearing was held before Administrative Law Judge ("ALJ") Wallace Tannenbaum. (R. at 11, 17). The plaintiff testified at the hearing that he experienced constant swelling, pain, and throbbing in the left knee. (R. at 32). His

13

activities included driving, visiting his daughter's school, light cooking, light laundry, walking "a block or two," and standing by the stove to cook.  (R. at 34-36, 39).  He used a cane "[m]ost of the time," including when he had to leave the house and when he cooked.  (R. at 39).  He reported that he was able to sit for up to two and one-half hours at a time without pain (R. at 37), and he would lie down with his leg elevated three to four times per day for two hours each time (R. at 38).

The ALJ issued a decision on April 11, 2014, finding that the plaintiff was not disabled under the Act.  (R. at 17).  The Appeals Council denied review on May 20, 2015 (R. at 1), and the ALJ's decision thus became the final decision of the Commissioner.  The plaintiff filed this action on July 7, 2015.

Analytical Framework

A.   Determination of Disability

A claimant is entitled to disability insurance benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also Barnhart v. Walton, 535 U.S. 212, 214-15 (2002) (explaining that both impairment and inability to work must last twelve months).  Disability must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. §

423(d)(3).   To be eligible for SSDI, a claimant must also demonstrate that he or she was disabled as of a date on which he was still insured.  42 U.S.C. § 423(a)(1)(A); see also Fleming v. Astrue, No. 06 CV 20, 2010 WL 4554187, at *9 (E.D.N.Y. Nov. 2, 2010).

In assessing a claim of disability, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).  The regulations outline a five-step sequential process for evaluating a claim of disability.  See 20 C.F.R. § 404.1520; Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).  At each stage of the analysis, the ALJ must adequately explain his or her reasoning, address all pertinent evidence, and fully develop the administrative record. Delacruz v. Astrue, No. 10 Civ. 5749, 2011 WL 6425109, at *8 (S.D.N.Y. Dec. 1, 2011).

At the first step, the ALJ must verify that the claimant is not currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. § 404.1520(c).  At step three, if the

impairment is included in the portion of the regulations known as "the Listings," 20 C.F.R. pt. 404, subpt. P, app. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d).

If the claimant is not considered disabled at step three, the ALJ assesses the claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4), (e). A claimant's residual function capacity is "the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine residual functional capacity, the ALJ identifies the claimant's functional limitations and assesses his or her work-related abilities on a function-by-function basis. Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam). The ALJ must also consider non-exertional factors that may further limit the claimant's ability to work. See McDonaugh v. Astrue, 672 F. Supp. 2d 542, 549 (S.D.N.Y. 2009).

At step four, the ALJ determines whether the claimant's residual functional capacity enables the claimant to do his or her past work. 20 C.F.R. § 404.1520(a)(4)(vi), (e). If not, the burden shifts to the Commissioner to demonstrate at the fifth step that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v), (g); Longbardi v. Astrue, No. 07 Civ. 5952,

2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009).  When the claimant has significant nonexertional limitations "over and above any incapacity caused solely from exertional limitations," the ALJ must use a vocational expert or other similar evidence to satisfy this burden.  Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986).

    B.   Judicial Review

    Under Rule 12(c) of the Federal Rules of Civil Procedure, judgment on the pleadings is appropriate where the moving party is entitled to judgment as a matter of law based on the contents of the pleadings.  Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010).  "In the context of an appeal from the denial of Social Security benefits, the administrative record is incorporated into the pleadings, making the matter appropriate for resolution on a Rule 12(c) motion." Joseph v. Astrue, No. 06 Civ. 1356, 2007 WL 5035942, at *4 (S.D.N.Y. Dec. 28, 2007); see also Abiona v. Thompson, 237 F. Supp. 2d 258, 265 (E.D.N.Y. 2002) ("[T]he parties refer to the administrative record, regulations, and ALJ decisions in the pleadings. Therefore, these documents are deemed incorporated in the pleadings and may properly be considered by the Court.").

    The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, a reviewing court does not determine de novo whether a plaintiff is disabled, but rather "is

limited to determining whether the SSA's conclusions were
supported by substantial evidence in the record and were based on
a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151
(2d Cir. 2012) (quoting Lamay v. Commissioner of Social Security,
562 F.3d 503, 507 (2d Cir. 2009)). "Substantial evidence 'means
such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126,
131 (2d Cir. 2000) (quoting Richardson v. Perales, 402 U.S. 389,
401 (1971)). "If substantial evidence supports the Commissioner's
decision, then it must be upheld, even if substantial evidence
also supports the contrary result." Ventura v. Barnhart, No. 04
Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006).

Although a reviewing court generally "defer[s] to the
Commissioner's resolution of conflicting evidence," Cage v.
Commissioner of Social Security, 692 F.3d 118, 122 (2d Cir. 2012),
it "is required to examine the entire record, including
contradictory evidence and evidence from which conflicting
inferences can be drawn" when assessing whether an agency
determination is supported by substantial evidence, Selian v.
Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Mongeur, 722
F.2d at 1038). A court must also independently ascertain whether
the correct standards were applied and remand when "there is a
reasonable basis for doubt whether the ALJ applied correct legal
principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998);

18

see also Talanker v. Barnhart, 487 F. Supp. 2d 149, 154 (E.D.N.Y.
2007) ("An ALJ's failure to adhere to any of [the procedural
obligations prescribed by regulation] constitutes legal error,
permitting reversal of the administrative decision.").

Analysis

A.   The ALJ's Decision

After confirming that the plaintiff met the insured status
requirements of the Act through December 31, 2016, the ALJ
proceeded through the five-step analysis.  (R. at 13).  At step
one, he found that Mr. Smith had not engaged in substantial gainful
activity since his alleged onset date of June 29, 2011.  (R. at
13).  At step two, he found that Mr. Smith had the following severe
impairments: left knee cartilage injury, status post arthroscopic
repair; right knee chondromalacia; and newly diagnosed lymphoma.
(R. at 13).  At step three, the ALJ determined that the plaintiff's
impairments did not meet or equal the criteria of an impairment in
the Listings.  (R. at 13).  The ALJ then found that the plaintiff
had the residual functional capacity to perform sedentary work.
(R.at 13).  At step four, the ALJ determined that the plaintiff
was unable to perform his past relevant work as a bus driver.  (R.
at 16).  Finally, at the fifth step, the ALJ determined that the
plaintiff could perform jobs that existed in significant numbers
in the national economy based on his residual functional capacity,

age, education, and work experience.  (R. at 17).  Thus, the plaintiff was not disabled under the Act.  (R. at 17).

B.   The Listings

At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. at 13).  An ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment."  Salmini v. Commissioner of Social Security, 371 F. App'x 109, 112 (2d Cir. 2010) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).  Here, the ALJ did not directly set forth a rationale for his finding that the plaintiff did not meet or equal any of the listings or discuss the listings he assessed.  However, "the absence of an express rationale does not prevent [a court] from upholding the ALJ's determination regarding . . . listed impairments, [if] portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence."  Berry, 675 F.2d at 468; see also Sava v. Astrue, No. 06 Civ. 3386, 2010 WL 3219311, at *3 (S.D.N.Y. Aug. 12, 2010).

The plaintiff contends that the ALJ erred in finding that he did not meet Listing 1.02(A), major dysfunction of a joint.  The Listing is

[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.  An "inability to ambulate effectively" sufficient to meet the Listing "is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b) (emphasis added).  Additionally, an individual must be unable to sustain a "reasonable walking pace over a sufficient distance." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b)(2).  The evidence here indicates that the plaintiff has used a cane and knee brace to walk since the onset of his injury.  (R. at 247, 276, 334-342, 452, 467).  He briefly used crutches after his arthroscopic surgery in January 2012 (R. at 332), but returned to using a cane within five weeks (R. at 334).  Dr. Hearns observed that the plaintiff "still has effective use of at least one extremity for carrying while using the [cane]."  (R. at 273).  Dr. Wilchfort reached the same conclusion.  (R. at 278).  Thus, the

21

plaintiff did not require a hand-held assistive device that limited the functioning of <u>both</u> upper extremities.  He was also able to walk and travel independently for short periods.  (R. at 34-36, 39, 171-72, 174).  Accordingly, he did not meet a requirement of Listing 1.02(A), and substantial evidence supports the ALJ's determination that the plaintiff's impairments did not meet or equal any of the listings.

  C. <u>Residual Functional Capacity</u>

  Jobs are classified by exertional levels based on the strength demands of the position, increasing incrementally from sedentary to very heavy work.  20 C.F.R. §§ 404.1567, 404.1569a.  Here, the ALJ found that the plaintiff had the residual functional capacity to do sedentary work.  (R. at 13).  Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. 404.1567(a).  Sedentary work "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day."  <u>Crowell v. Astrue</u>, No. 08 Civ. 8019, 2011 WL 4863537, at *3 (S.D.N.Y. Oct. 12, 2011) (quoting <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996)); <u>see also</u> SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

The ALJ cited no meaningful evidence that the plaintiff had the ability to stand or walk for up to two hours per day, nor is any such evidence apparent in the record. Dr. Hearns consistently noted limitations for standing and walking throughout his two-and-a-half years treating the plaintiff. (R. at 236-46, 251-57, 487-89, 496-506). In a July 2012 Function Report, Dr. Hearns assessed that the plaintiff could stand or walk for less than two hours per day. (R. at 270). Significantly, the Function Report provided the option to check a box stating that the plaintiff could stand or walk for "up to 2 hours per day" -- the amount required for the full rnage sedentary work -- yet Dr. Hearns checked the box for "less than 2 hours per day" instead. (R. at 270 (emphasis added)). This was the only report cited by the ALJ bearing directly on the plaintiff's ability to stand or walk.

The opinion of a treating physician like Dr. Hearns regarding the nature and severity of a plaintiff's impairments "will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the record].'" Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)); accord Shaw, 221 F.3d at 134. "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion."

23

<u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004) (quoting 20 C.F.R § 404.1527(c)(2)).  These factors include

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

<u>Id.</u>; <u>see also</u> 20 C.F.R. § 404.1527(c)(2).  Explicit discussion of each factor is not required so long as it is clear that the ALJ undertook the proper analysis, <u>Halloran</u>, 362 F.3d at 32–33, though the ALJ must "always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a] treating source's opinion," 20 C.F.R. § 404.1527(c)(2).

The ALJ's opinion is bereft of any indication that he considered these factors in evaluating Dr. Hearns' assessment of the plaintiff's ability to stand and walk.  Indeed, the ALJ mischaracterized Dr. Hearns as a physical therapist without a medical license (R. at 15), and thus did not acknowledge his status as a treating physician.  Moreover, Dr. Hearns' assessment is consistent with much of the medical evidence in the record indicative of the plaintiff's inability to stand or walk.  MRIs in 2011 and 2012 showed cartilage damage in the left knee (R. at 258-61), and reports of Dr. Tyorkin, Dr. Wilchfort, and the plaintiff's physical therapists noted significantly limited range of motion in

the left knee (R. at 276, 328, 330, 334, 376, 421, 446, 453, 468).
Dr. Wilchfort observed that the plaintiff was unable to toe walk,
heel walk or squat, and noted positive straight leg raising tests
for both legs (R. at 276); furthermore, the plaintiff's own
statements described a limited ability to stand and walk.[4]  (R. at
38-39).  The ALJ also mischaracterized, and thus disregarded, Dr.
Wilchfort's assessment that the plaintiff could not perform jobs
requiring  any  activity  as  merely  reporting  the  "subjective
complaints" of the plaintiff.[5]  (R. at 16).

_____

[4] The plaintiff's statements that he could walk up to ten
blocks with a knee brace and cane (R. at 174), occasionally visited
his daughter's school (R. at 34-35), went grocery shopping with
his wife twice per month (R. at 172), and did chores like "light"
cooking and laundry (R. at 36), are not inconsistent with a finding
that he could stand or walk for less than two hours per day.  See
Molina v. Colvin, No. 13 Civ. 4989, 2014 WL 3445335, at *15
(S.D.N.Y. July 15, 2014) ("There is a big difference [] between an
occasional walk or shopping trip and sitting/standing for an eight
hour workday.").  The plaintiff's other statements indicate a
significant limitation for standing and walking -- he testified
that he generally walked only "a block or two" and spent as many
as eight hours per day lying down with his leg elevated.  (R. at
38-39).

[5] Dr. Wilchfort's report states: "Any job that is going to
require any activity at this point is going to be impossible."
(R. at 277).  This assessment is contained in the "Summary" section
of his report, where Dr. Wilchfort summarizes his medical findings
and recommendations.  (R. at 276-77).  Throughout the report, Dr.
Wilchfort  indicates  explicitly  when  he  is  discussing  the
plaintiff's  subjective  complaints  by  prefacing  them  with  the
phrase "he says" (R. at 276-77), including in the clause that
immediately follows his assessment of the plaintiff's capacity to
work.  (R. at 277 ("Any job that is going to require any activity
is going to be impossible, he says he cannot even walk without a
cane.")).  No such qualifier precedes Dr. Wilchfort's assessment
that  the  plaintiff  could  not  perform  work  that  requires  any

The remaining reports evaluating the plaintiff's ability to stand and walk are mixed but minimally probative. Dr. Clarke noted unspecified limitations for standing and walking in July 2011 (R. at 249), while the MTA physician did not note limitations for walking in March 2012, (R. at 423). That alone, without any analysis from the ALJ, is insufficient to support the finding of an ability to stand or walk for up to two hours per day for a residual functional capacity to perform the full range of sedentary work.

---

activity. Thus, the ALJ's reading of Dr. Wilchfort's assessment as repeating the plaintiff's subjective complaints is incorrect.

The Commissioner's motion for judgment on the pleadings correctly reads Dr. Wilchfort's assessment that the plaintiff could not do work that requires any activity as a medical conclusion, but misconstrues it to stand for the proposition that the "[p]laintiff would only be unable to perform a job which required activity." (Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Def. Memo.") at 14). Accordingly, the Commissioner argues that Dr. Wilchfort's opinion supports the ALJ's residual functional capacity determination because he "clearly found [the] [p]laintiff capable of working, and sedentary work encompasses the lowest level of physical exertion." (Def. Memo. at 14-15). Dr. Wilchfort did not, however, assess the work the plaintiff could do or state that he found the plaintiff capable of working. He only assessed the work the plaintiff could not do -- namely, that which required "any activity." He did not clarify the meaning of "any activity," though, notably, the full range of sedentary work still requires lifting up to ten pounds and standing or walking for up to two hours per day. Accordingly, Dr. Wilchfort's assessment does not, as the Commissioner argues, support the ALJ's determination that the plaintiff was capable of sedentary work.

The other evidence cited by the ALJ to support his residual functional capacity finding is immaterial.  The ALJ noted that Dr. Tyorkin "failed to provide any evidence that the claimant could not perform sedentary work, since no prohibitions on extended sitting were suggested" at a March 10, 2012 visit.  (R. at 14). Similarly, he noted that "[n]o specific vocational limitations were cited" at an October 5, 2012 visit with Dr. Tyorkin.  (R. at 15).   However, Dr. Tyorkin never assessed the plaintiff's functional limitations, nor did the ALJ ask Dr. Tyorkin to make such an assessment.   Accordingly, the absence of information regarding the plaintiff's functional limitations in Dr. Tyorkin's reports does not support the ALJ's finding that the plaintiff was capable of sedentary work.   Therefore, the ALJ's residual functional capacity determination is not supported by substantial evidence.

   D.   Credibility Determination

   "In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony."  Kessler v. Colvin, 48 F. Supp. 3d 578, 594 (S.D.N.Y. 2014); see also Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010) ("Before finding that [the claimant] was not a credible reporter of his own limitations, the ALJ was required to consider all of the evidence of record, including [the claimant's] testimony and other statements with

respect to his daily activities."). Because "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," 20 C.F.R. § 404.1529(c)(3), the regulations require the ALJ to consider several factors to assess the claimant's credibility where the plaintiff's testimony concerning the intensity, persistence, or functional limitations associated with his impairments is not fully supported by clinical evidence, 20 C.F.R. § 404.1529(c)(2), (3); Kessler, 48 F. Supp. 3d at 594. Those factors include the plaintiff's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication undertaken to alleviate the pain; and measures undertaken by the plaintiff at home to relieve pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vi).

"[C]ourts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe [the] plaintiff's demeanor while testifying." Marquez v. Colvin, No. 12 Civ. 6819, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013). Nevertheless, if an ALJ "finds that a claimant is not credible[,] [he or she] must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.'" Henningsen v. Commissioner of the

28

Social Security Administration, 111 F. Supp. 3d 250, 268 (E.D.N.Y. 2015) (quoting Rivera v. Astrue, No. 10 CV 4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012)). Here, following a narrative summary of the plaintiff's medical record, the ALJ concluded that "the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. at 16). The summary of the plaintiff's medical record preceding this conclusion lacks the required specificity to determine whether the ALJ's credibility finding is supported by substantial evidence.

First, the ALJ did not discuss any of the plaintiff's hearing testimony or the Function Report he filled out in connection with his application for benefits; he only discussed the plaintiff's complaints of knee pain and functional limitations at visits with various physicians. The deference I owe to the ALJ's credibility determination based on his observation of the plaintiff's testimony is limited here since the ALJ failed to indicate whether he considered the plaintiff's testimony at all. Moreover, this prevented the ALJ from considering the plaintiff's reports of his daily activities or the measures he takes at home to alleviate pain, such as lying down with his leg elevated (R. at 38), which are among the factors to be considered in making a credibility determination, 20 C.F.R. § 404.1529(c)(3)(i), (vi).

Second, the ALJ compared the objective medical evidence with the plaintiff's statements only with respect to Dr. Wilchfort's consultative examination, writing, "Significantly, despite the claimant's complaints of left knee pain, the physician observed that 'the knee appears normal on the left. There is no swelling, no deformity.'" (R. at 16 (quoting R. at 276)). The ALJ also noted, "According to the consultative physician, the claimant had full 5/5 muscle strength bilaterally, despite his complaints." (R. at 16). However, Dr. Wilchfort's other findings are consistent with the plaintiff's assertions of pain and functional limitations, including positive straight leg raising tests on both legs, limited range of motion in the left knee, and his recommendation that the plaintiff refrain from work requiring "any activity." (R. at 276). The ALJ discussed these findings but did not mention them in connection with his assessment of the plaintiff's statements.

Much of the other medical evidence in the record is consistent with the plaintiff's statements regarding the severity of his condition. An August 2011 MRI of the plaintiff's left knee showed a 1.7 cm osteochondral lesion, and a June 2012 MRI of the left knee showed cartilage thinning and fissuring. (R. at 258-61). Numerous reports from Dr. Tyorkin and the plaintiff's physical therapists noted range of motion of 0-90 degrees or less in the plaintiff's left knee. (R. at 328, 330, 334, 376, 421, 446, 453,

468).   The  ALJ  omitted  most  of  these  reports  from  his  opinion;
without  explanation,  he  focused  selectively  on  reports  that  showed
a  better  (0-100  degrees  and  above),  though  still  sub-normal,  range
of  motion  in  the  left  knee.   (R.  at  14-15).   Finally,  Dr.  Clarke
and  Dr.  Tyorkin  noted  on  several  occasions  from  July  2011  through
April  2012  that  the  plaintiff  had  "temporary  total  disability"
that  prevented  him  from  returning  to  his  job  as  a  bus  driver.   (R.
at  249,  329,  334,  339).   Though  this  is  a  worker's  compensation
term,  it  does  tend  to  show  that  the  plaintiff's  physicians  credited
his  statements  regarding  the  severity  of  his  condition.   The  ALJ
did  not  make  clear  if  or  how  he  weighed  any  of  this  evidence
against  the  plaintiff's  statements  in  making  his  credibility
determination,  nor  did  he  consider  the  factors  set  out  in  the
regulations.   Accordingly,  the  ALJ's  decision  lacks  the  required
specificity  for  me  to  decide  whether  his  credibility  determination
is  supported  by  substantial  evidence.

E.     Post-Decision Medical Evidence

Mr.  Smith  attached  a  "Residual  Functional  Capacity  Form"  and
"Walking  Questionnaire,"  both  filled  out  by  Dr.  Stephen  Roberts
and  dated  June  23,  2016,  to  his  motion  for  judgment  on  the
pleadings.   The  documents  purport  to  provide  evidence  of  the
plaintiff's  functional  limitations  dating  back  to  July  2011.
(Residual  Functional  Capacity  Form,  attached  as  Exh.  to  Memorandum
of  Law  in  Support  of  Plaintiff's  Cross  Motion  for  Judgment  on  the

Pleadings filed Dec. 28, 2016 ("Pl. Memo."); Walking Questionnaire, attached as Exh. to Pl. Memo). The plaintiff argues that these reports require remand for further proceedings.

Because remand is appropriate for the reasons already discussed, the question is whether the ALJ should be ordered to consider Dr. Roberts' reports on remand. A district court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has interpreted this language to require the new evidence to satisfy a three-pronged test: (1) it is new and not cumulative of what is already in the record; (2) it is material, meaning that it is probative, relevant to the plaintiff's condition during the time period for which benefits were denied, and could have influenced the Secretary's decision; and (3) there is good cause for the plaintiff's failure to present the evidence earlier. Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1998); Perez v. Colvin, No. 14 Civ. 9733, 2016 WL 5956393, at *13 (S.D.N.Y. July 21, 2016); see also 42 U.S.C. § 405(g).

The records submitted by the plaintiff fail on the second and third prongs. With respect to materiality, the reports present only conclusory statements regarding the plaintiff's functional

limitations.  Although they purport to provide information that is applicable back to 2011, the plaintiff provides no evidence that Dr. Roberts treated him prior to the June 2016 visit or how Dr. Roberts made conclusions about his functional limitations over the last five years.  With respect to good cause, the plaintiff provides no reason why he could not have consulted with Dr. Roberts and submitted this evidence during the time between his initial application for benefits in March 2012 and the Appeals Council's denial of review in May 2015.  Thus, while the ALJ may consider Dr. Roberts' reports on remand, he should not be ordered to do so.

F.   Remedy

Even though I recommend reversal of the ALJ's decision, remand solely for calculation of benefits is not warranted.  Under 42 U.S.C. § 405(g), a reviewing court has the power to affirm, modify, or reverse an ALJ's decision with or without remanding the case for a rehearing.  Only when a court finds "no apparent basis to conclude that a more complete record might support the Commissioner's decision" is remand solely for a calculation of benefits warranted.  Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999).  Although the ALJ's errors here mandate remand, the plaintiff has not demonstrated that the record so clearly supports his claim of disability such that further consideration of the issue would serve no purpose.  See, e.g., Butts v. Barnhart, 388 F.3d 377, 385-86 (2d Cir. 2004).

33

On remand, the ALJ should be directed to: (1) evaluate Dr. Hearns' opinion regarding the plaintiff's functional limitation for standing or walking in accordance with the treating physician rule; (2) set forth a residual functional capacity determination accounting for all of the plaintiff's limitations and explain that determination; (3) reassess the plaintiff's credibility; and (4) base his step-five analysis on the properly determined residual functional capacity.

Conclusion

For the reasons set forth above, I recommend that the Commissioner's motion for judgment on the pleadings be denied, the plaintiff's motion for judgment on the pleadings be granted, and this case be remanded to the Commissioner for further proceedings consistent with this opinion.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Edgardo Ramos, Room 410, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
      January 4, 2017

Copies transmitted this date to:

Wendy Brill, Esq.
Wendy Brill Attorney At Law
9 Murray Street, 4th Floor
New York, NY 10007

Fergus J. Kaiser, Esq.
U.S. Social Security Administration
26 Federal Plaza, Rm. 3904
New York, NY 10278